Ladies and gentlemen, we are here to hear an in-bank argument in the Lands Council v. McNair. I have been told that the Council have proffered two counter-photographs, one from each side. Is that correct? And I take it you've all seen each other's photographs. Okay. You may proceed. Thank you, Your Honors. My name is Tom Woodbury. After the court granted on-bank review in this case, I was asked to handle these proceedings. In part, I imagine, because I had handled the Ecology Center v. Austin for the appellants in that case, as well as Lands Council v. Powell and Idaho Sporting Plumbers v. Rittenhouse. So I appreciate the opportunity today to try to bring some clarity to this line of authorities. And with that in mind, I'd like to begin by saying that the Ecology Center case is not binding law in this circuit and does not dictate the outcome of this case. And the reason for that is actually quite simple. The law of the forest under the National Forest Management Act is different for every national forest in the country. And under the Arbitrary and Capricious Standard, the analysis is driven by the law and the facts. Obviously, the conditions of every forest are different. The facts of every case are different based on the administrative record. And the law of every forest in this country is different, especially given the Forest Service's position that there are no longer any regulations in place because previously this Court in Inland Empire had held that the 82 regulations under NIFMA were of independent force, in effect, at both the project and planning level. So at that time the law of every forest is different. But the standard that applies doesn't differ depending upon the forest. The standard of review. And Austin adopted an approach and imposed a standard of verification on the agency's methodology and models and assumptions. That is binding. No. The Court in every one of these cases, Your Honor, applied the Arbitrary and Capricious Standard of review. The application of that standard in every one of these cases has been slightly different and brings the results that you're referring to. But the requirement for integrity of science and disclosure of methodology and insurance of species viability, those are all statutory standards. So in applying the Arbitrary and Capricious Standard of review, or even in applying the hard-lip doctrine under National Environmental Policy Act, you have to be cognizant, obviously, of the substantive standards that apply. So when the substantive standard is insurance to ensure soil productivity, for example, under the National Forest Management Act, then obviously that's going to affect the hard-lip doctrine and the Arbitrary and Capricious Standard of review. And if it turns out, as in Ecology Center v. Austin, that what the Forest Service is relying on is not science but is actually speculation, then they're not insuring you. Counsel, let me ask you something about that distinction. Obviously, we can't make our own judgment about what's good for the forest. There are probably those of us, in fact, I know of at least one of us, who couldn't tell the difference between a fir and a larch and a ponderosa pine. The Forest Service knows that sort of thing. I don't understand why we would, unless what they relied on was totally ridiculous, why we would substitute our judgment for the agency's on what kind of science was adequate to make judgments. Okay. Actually, I agree with that.  I'm sorry? You agree that the standard is whether it's totally ridiculous? I mean, is that what you're agreeing with? I agree that the Forest Service is the expert in silviculture. I agree that this Court needs to defer to valid science. I would point out. No, I didn't say valid science. Scientists differ about what is valid science. There are debates in the New England Journal of Medicine on whether some study was valid science. I mean science that's beyond the pale, as opposed to arguable science. How do we determine? You have two different scientific propositions, one from the Forest Service and one from, say, an environmental group. What is the standard we are to use in determining whether there is, which one is better? Is that our role under the law? It depends on what kind of science, but I would say no. The agency's action is arbitrarily capricious based on, not on the Court's evaluation of science and valid or whatever, but basically the Court has to take a thorough look at the agency's rationale and determine whether or not. I understand that. This was the ridiculous comment that you mentioned to Judge Berzon. I guess what I'm concerned about is it's really easy in the abstract to say, you know, you've got to have valid science, but we're not scientists. We're judges. And although some of our number may be more scientifically oriented than others, as Judge Kleinfeld has suggested, the reality is that neither the statute nor case law that follows the statute requires us to be scientists. Is there not a deference that we're supposed to provide to the agency in this case unless they simply don't provide any scientific evidence? The agency is under a statutory standard to apply integrated physical, biological science. Are we not talking about the forest statute or the or NEPA or both? What's the you could refer to as statute. Are we talking about the National Forest Management Act, or are we talking about NEPA? The National Forest Management Act requires. What's the answer to my question? What statute are you talking about? When you say the statute, I understand. I was just repeating what I had just told Judge Smith. The forest act requires the application of a systematic interdisciplinary. All right. So we're talking about the forest act. That's all I was trying to find out. Go ahead.  And NEPA requires integrity of science and disclosure of knowledge. Let's say we got past where we've started. Why is this 277-acre parcel of northern Idaho woods different from all other 277-acre parcels of northern Idaho woods? The concept of sampling, that's how pharmaceutical manufacturers test pills. They don't test each one. And the idea of projecting from one experience to another is how we design space suits and food for a trip to the moon, where we've never done a walk around, as Ecology Center seems to say you have to do before you do anything. Is there something special about this 277-acre parcel? Yes, they've been logging it for 30 years, Your Honor. Let me interject here. As I understand it, we're on appeal from a denial of preliminary injunction at the district court level. And we even denied an injunction, saying that we wouldn't have an injunction for the winter of 2007. Now, what deference do I give to the district court judge who had this hearing in front of him, who had the opportunity to hear all the witnesses? What deference do I give to him? I mean, he has the same standard that I do on injunctions. Do I owe him any deference in the fact that he went through this and then had the opportunity to review all of these things? Isn't that a standard we get to even before we get to trying to apply this injunctive standard ourselves? Yeah. You're basically required to determine or were required to show that he made or that he either misapplied the law or made clear factual findings. I have to have a definite and firm conviction that he committed a clear error. Yes. Don't I? Yes. So even to get to where we're getting with all this stuff about whether we do the injunction or not, it seems to me that one ought to address that factor. Yes. First, he made a clear error because this court ruled in Lands Council v. Powell that the Forest Service cannot rely on forest-wide habitat proxies because the TSMRS database was invalid. So the first error that he made, and the court ruled in Lands Council v. Powell that you can't rehabilitate that forest-wide habitat proxy with project area population data. So the first error he made was that he misapplied the law because the court, we've already proven, Your Honor, that the forest-wide habitat proxy is not reliable. And so it wasn't incumbent on us to prove that again. And so the question becomes, the court said, this court said in Lands Council v. Powell that population data was required. So in this case, the Forest Service is using a forest-wide habitat proxy model for flammulated owls, and they have to show that that habitat model is valid. That habitat model depends and relies on the same database, the TSMRS database, that this court found unreliable. And the Forest Service said in response to that that they were presuming it was reliable. So that's the first factual error that the lower court made was by the law. That's how the Forest Service, that's the database for proving that there is 10 percent old growth habitat in the Idaho Panhandle. Kagan. So this is essentially the issue that you lost before the panel. I'm sorry? It's the issue that the panel on this case said was as to which the panel, pre-judge panel, upheld the Forest Service in this case. In this case, they did. Okay. They didn't apply that ruling from Lands Council v. Powell, though. So your problem here is that you're saying that the database about the composition of the forest, current composition of the forest, is incorrect. Yes. Both in the project level and forest-wide. I thought, however, that the Forest Service completely refuted this 10 percent issue that you raised with its own reports, and it refuted the study that you relied upon, the Zach study, because it itself was not based on a representative, non-biased sample design and was not credible. So aren't we really back to the same situation again where you've got scientists on both sides, we're not scientists, and we get back to what is our role? Don't we defer when you've got disputes between scientists? We have to rely on the agency unless it's absolutely clear that they have applied the wrong standard and the wrong law. Yes. And I'm not referring to or relying on that lost forest report because it's not necessary, because it doesn't add anything to what this Court had already found in Lands Council v. Powell. But that's what they relied upon in Lands Council, is it not? The same thing that has now allegedly been refuted? I'm sorry. Could you repeat that? It is not the point that you were making before, that in Lands Council 1, that they were relying upon this report, the Zach report, that has now been refuted and coming to the conclusion on the proxy matter. No. Lands Council v. Powell, the Forest Service, just as they are here, they were relying on the TSMRS database to show that they had 10 percent forest, old-growth habitat forest-wide. And the Court said, you know, that the habitat proxy, the forest-wide habitat proxy, was unreliable because this TSMRS database is unreliable. Well, what did it rely upon in order to make that determination? What do I rely on? No, no. What did the Lands Council 1 recall? Lands Council v. Powell, Lands Council 1 for shorthand. Isn't the very thing you're talking about what they relied upon to reach that conclusion on the 10 percent requirement? Yes. The Lands Council v. Powell relied on the evidence from the Forest Service itself that the TSMRS database was unreliable. Well, let me ask you, what underlies these cases, and you're probably in a perfect position to think about it since you were there in the beginning, so to speak, with Lands Council 1, Ecology Center, and then this. But underlying all these cases is the premise that we have now created as black-letter law on the circuit that you must have an on-the-ground analysis and that you can't use what would be scientific hypothesis and extrapolation. Were we to conclude that we've been misguided in adopting those as hard-and-fast rules, how then would you analyze this case? On traditional arbitrary and capricious analysis, and if I might actually explain that, the agency in this case failed to consider an important aspect of the problem. They assert that the majority of the 364 acres of dry-site old growth in the project area is currently suitable habitat for the flammulated owl. The majority of that habitat has been logged for 30 years for the very purpose that they want to log it here, to improve the habitat for the flammulated owl. And yet when they went and sent their biologists out to those 364 acres, that their model tells them is suitable flammulated owl habitat. They were not able to find a single flammulated owl anywhere in that logged habitat. Counsel, it seems to me you're expanding apart to the whole. The Forest Service plan by its own terms is not based simply upon improving habitat for the flammulated owl. They think that some critters will do better with clearing out some of the brush and the smaller fir trees that have displaced the larch and the ponderosa pine. They think other critters will do worse. Their overarching concerns seem to be forest fires, a very serious concern indeed, and the beetles that kill the trees and produce fuel. What they say in their report is basically because of the government's own past fire suppression policies, they've created a forest that is not like what it used to be, has different trees, and is made up in large part of tinder and kindling. And it wasn't just a matter of they're trying to improve habitat for the flammulated owl and they haven't found enough flammulated owls to show that improving habitat for flammulated owls will make any difference. Your Honor, the flammulated owl was designated by the Forest Service as the indicator species for the old growth habitat that they're logging, and that's the logging that we're challenging. They didn't look for any other creatures in that. That's the only species you're challenging right now? I'm sorry? And you're telling us we should just focus on the flammulated owl and that's it? Yes. The flammulated owl is the indicator species for the old growth habitat that they want to log. They've logged the majority of that same habitat for 30 years to improve habitat for the flammulated owl. There are no more flammulated owls in that habitat. And they say that they validated this model for flammulated owl habitat by sending their biologists out there to look for flammulated owls. They didn't find any, and somehow that validates their model and they need to keep logging it. Counsel, I don't understand. I don't understand why you say they've logged it for 30 years in order to improve habitat for flammulated owls. Because that's what the Forest Service does. It looks to me like they've logged it for 30 years to get logged. They've logged it for 30 years. The majority of the – this is the Forest Service, from SER 199. The majority of the 364 acres of currently suitable habitat in the project area have been commercially thinned or partially regenerated in the past 30 years, which created and maintained suitable habitat conditions for the flammulated owl. That contradicts what you just said. Which created and for are two different things. One describes a side effect and one describes a purpose. They obviously have multiple purposes. One purpose of logging is to get logs. Another purpose of logging has been to let the larch and ponderosa pine that used to make up that forest replace the fir. All they've described there that you question is a beneficial side effect for the flammulated owls. No. They say which created a better habitat for the flammulated owls. It's the same rationale. It was logged for creating a better habitat for the flammulated owls. They've logged it repeatedly. It's allocated – Do you understand the distinction? Have I made myself clear? It's allocated old-growth habitat, yes. It's allocated old-growth habitat, meaning it's been set aside for the benefit of species under the forest plan. It's allocated old-growth habitat, so the only reason they can log it is for old-growth species. They tell us they've been logging it for the benefit of flammulated owls, their indicator species for this habitat in the project area for 30 years, and they need to log it some more. And they know that this habitat model is valid because they went out and they couldn't find any flammulated owls. Now, I would submit that that's arbitrary capricious because it overlooks the most important factor underlying their model, which is there are no flammulated owls inhabiting this forest. So is your argument, then, that they themselves, the Forest Service, has agreed that a test in the balancing between logging for fire suppression and storing old-growth, that they have set up as their own standard of test for wildlife preservation that there should be flammulated owls in the habitat once they have accomplished their plan? You're saying they've been doing it for 30 years according to the same kind of rationale and plan. They sent somebody out. There are no flammulated owls, so their own self-imposed measurement hasn't been met. That's right. It's a failed habitat proxy, exactly like in Lands Council 1. It's almost bizarre to me, in a way, because one of the allegations that you make is they didn't do an on-the-ground analysis, and yet now you're telling us that they checked the whole area and didn't find any. Did they do an on-the-ground analysis, or didn't they? Yes. They sent an SER-193 and an SER-199. If you just read those two sections, you will see everything you need to see in order to determine this is arbitrary capitious. So why was there a claim, then, that there was no on-the-ground analysis, if you're correct? That's an incorrect claim. Okay. They say in their brief, in their response brief, to the merits, that they validated this model because we challenged their model. They say we validated that model, and they referred to these sections of the supplemental excerpts for record. And, yes, and it says in here very clearly that they validated that model for determining flammulated owl habitat by sending their biologists out there on numerous times for like six or seven different years. They've been sending their biologists out there looking for flammulated owls, including for this project. And they haven't found any. Counsel, counsel. The question is, why haven't they found any flammulated owls? Counsel. Habitat says they should be there. Counsel, you want us to do the whole case on flammulated owls, on the theory that they've been trying to get flammulated owls back for 30 years by logging, and it failed, no flammulated owls, so it's arbitrary and capricious. I look at SER 48, and it precisely contradicts what you say. It says there are four purposes, vegetation, aquatics, wildlife habitat, and recreation. Three purposes have nothing to do with flammulated owls. That's right. One balances the sort of critters who do better with the fur against the critters that do better with the larch and pine. You want us to build the whole case around the lack of success of getting flammulated owls, because you say that's the purpose of the project. And the statement of purpose of the project at SER 48 contradicts what you say. No, it doesn't, Your Honor. Show me how. Look at SER 48. This is a project, and we are challenging 277 acres of logging of old-growth habitat. If they didn't have that in there, we wouldn't be challenging this project. If they were not logging designated old-growth habitat, Your Honor, we would not be here today. That is the aspect of the project we are challenging, and we are challenging their rationale for logging it because it's totally ‑‑ it doesn't make any sense. If there were only 277 acres you were challenging, why did you not sink an injunction which was not to the whole project? I mean, we had a mushy, brushy mission sale. We have the Howler Down sale. We have the Mission Flyby sale. All of those are stands, but the only stands are in Howler Down and Mission Flyby, and you're saying 277, yet you want to enjoin the whole project. Why is that? It seems to me, again, we should be relying on the discretion of the district judge who heard these things, who heard what the situation was at that point, and when I have to find that he, in fact, made clear error when the best now you're suggesting is 277 acres, it looks a little tough. This is the issue that we're trying to get injunctive relief on, and if we had gotten injunctive relief against any old-growth logging in this project, I think we would have been satisfied to go ahead with summary judgment proceedings on the rest. There are other issues, Your Honor, but we can't ask for injunctive relief based on every issue that might be there before we even have an administrative record. Could you be more precise than getting down to your challenge? Your challenge under the National Forest Management Act relates solely to the 277 acres? It relates to ensuring species viability, Your Honor, in accordance with the forest plan, which requires them to ensure. That's a lot of talk and no action in terms of us trying to figure out what your claim is. Has there been more? Under NIFA, can you tell us what parcel is at issue, what species, and what the Forest Service did that violated NIFA? The NIFA under 1604i of the Forest Act. Let's just start with what parcel. I'm sorry? What parcel, what species, what actions in that order under NIFA is the violation? Parcel? Yeah. Is it 277 or is it the whole logging? Is it the whole project? For purposes of injunctive relief, I would say we were challenging the old-growth logging. That was the primary concern for seeking injunctive relief. Okay. So you actually are challenging both the Mission Brush, the whole Mission Brush project? Yes. Okay. We're challenging. We are challenging the record of decision. Okay. Just stop, because, you know, what you say in your briefs and what you say here and what you argue to the panel seem to be different things. So now we're here in Embank and we can kind of try to get the record straight. Are you challenging the entire Mission Brush project as being in violation of NIFA?  Now here. This is now here. We are here on injunctive. We are challenging the old-growth. We are challenging old-growth logging under this decision. On the whole Mission Brush project, correct? Yes. Okay. You've got about two minutes left. Would you like to save for rebuttal? Can you finish the answer to this question? So that's what you're challenging, solely related to the flammulated owl, correct?  Old-growth logging. That's the indicator species. Old-growth logging vis-a-vis the owl, because that's the indicator species. And then finally, the specific violation of NIFA that you're challenging vis-a-vis the injunction is what? Inconsistency with the forest plan. Okay. They don't have 10 percent old-growth forest-wide, as this Court found in Lands Council v. Powell. And in the project itself, they're not ensuring the viability of flammulated owls. And has logging actually occurred on any of the areas in the project such that it would moot our consideration of any of those areas? No. No? Okay. I'll reserve what little time I have left for rebuttal. Very well. We'll hear from the other side. Good morning, Your Honors. My name is Andrew Mergen, here on behalf of the Forest Service this morning. I'm going to split my time with Scott Horngren, who is here on behalf of Boundary County and the City of Bonners Ferry, Idaho. And I'm going to try to limit myself to 20 minutes or less this morning. I understood Council for Lands Council to indicate this morning that insofar as the preliminary injunction, which is what, after all, is on appeal here, that they were concerned about the logging within the 277 acres of old-growth stands, and in particular the effects or the Forest Service's judgments with regard to that aspect of the project vis-a-vis the flammulated owl. I plan to do basically three very brief things. Is the flammulated owl in fact designated as a management-educated species? It is, in fact, designated as a sensitive species. Right, but that's different. Isn't that different? It is different. Do you want me to discuss the differences, Your Honor? Well, I'm just curious about why that representation was made and whether it matters. I don't think it really matters, Your Honor. But there is a difference, and it's discussed on page 190 of the SER, the government SER, and that's where both sensitive and management-indicator species are defined. And management-indicator species are species that the Forest Service keeps an eye on because they're interested in a particular type of habitat. And sensitive species are species that they're keeping an eye on because there aren't very many of them. And both of those concepts have sort of been overridden by later regulations, but applied here nonetheless because they were incorporated in the forest plan that's governing here. Is that right? I think that's a fair statement, Your Honor. The forest plan that governs here was issued in 1987, and there's a viability regulation that was promulgated in 1982. The Forest Service has replaced it. That's the only mention of viability period in terms of these species. But as the record shows, they looked at viability for every one of these species as they went through and authorized the Mission Brush Project. And the record is really replete with evidence. Now, the quality of evidence necessarily varies because for some species, if you were to conduct a literature search, you would find a lot of papers and a lot of information. And for other species, less is known. So it's not one size fits all for every species. But if you go to the record, what you see is there's Chapter 3 that sort of talks about the conditions for these species today and Chapter 4 of the supplemental EIS that looks at sort of what the effects of the project would be for each of the appropriate sensitive species and MIS species. Kagan. Could you address what I understand to be the central argument he's making about why this – well, he is making two about why the science is no good, but leave aside the 10 percent question. Right. The other one is that the representation that there had been logging in this area over 30 years of the kind that's proposed now, let's leave aside the question of what it was for, and that there are no owls there now and that that should be sufficient to disprove the hypothesis. Well, I don't think that – I mean, this – first of all, I would take issue, and I think the record makes this plain, and I think Judge Kleinfeld pointed to the right record site for this, is that what the Forest Service said with regard to – and if you indulge me for one second, I'd maybe talk a little bit about what the Forest Service did with regard to these species. They – with regard to these sensitive MIS species, they looked out on the Forest Service landscape and they said, we want to identify capable habitat for these species and suitable habitat. And there's a difference. The capable habitat is their fixed attributes on the landscape that could provide habitat for these species down the line as the, you know, the ecological processes work out. They – the fixed attributes tend to be things like soil, the type of soil, the aspect, like whether you're getting southern exposure or northern exposure, slope. Those sorts of things are fixed attributes for certain species on the landscape, and that's what they mean when they talk about capable habitat. And then there's suitable, which is it's got all of that and it's got what the critter likes. It has the canopy cover, et cetera, et cetera. With regard to the flammulated owl, those areas that are identified in the record as suitable habitat because they look at the science and they say, these are the things that flammulated owls like. And you don't have to take the Forest Service's word for it. If you open a bird book, it will tell you that flammulated owls like ponderosa pine. They like this dry site old growth. That's where they live. And so on the landscape, they designated habitat as suitable for flammulated owl that has all of those requirements. And that's what the record reference that Mr. Woodbury is referring to is. Those areas that have been logged in the past have the big ponderosa pines and the larch because those trees are shade intolerant. They need more open space. So those types of conditions that are suitable for flammulated owl are out there. Now, the issue that's most important for the United States today here is clearly how does the arbitrary and capricious standard of 706 apply to these sorts of cases? And insofar as the flammulated owl is concerned, we think it's very straightforward. The Forest Service took a look at various studies that said flammulated owl can live in these sorts of habitats where this logging occurs. I mean, this is occurring in old growth, but no old growth is being taken. They're taking out the little trees because they squeeze out the ponderosa pine. And studies like the Howie and Ritzy study from southern British Columbia, which is only really 20 miles away from the project site, are studies where scientists have gone out and they say flammulated owl live in this habitat. And the record here shows that, you know, the Dawson Ridge study, which has become sort of a lightning rod, they went out, they got a response. That indicates that the owl is occupying that habitat. Now, Dawson Ridge, please don't misunderstand me, is not in the project area. But it's a very similar area to those sorts of habitats that the Forest Service has designated as suitable. Well, that's all fine, but as to this particular area, they went out and they found no owls. So how can you hypothesize that there would be owls? Well, these creatures are difficult to find and locate. It's not a question of going out into a park with a pair of binoculars. They're migratory. They're little owls. They're about the size of a robin. They spend their summer months in Guatemala and Mexico, and they come back out onto the forest in May. And people, when they verify that they're there, they don't see them. They get a call response. They have their call on tape, they call it out, and they get a response. Because these are difficult animals to keep track of. Doesn't that argue in favor of an on-the-ground requirement? I want to take that question in two parts, Your Honor. The Forest Service did on-the-ground work here, right? I mean, that's really clear. And I would like to direct the Court's attention to SCR 262, which talks about how the wildlife capability and suitability habitat studies were done. Because they did scientific literature reviews, they looked at wildlife databases, they did surveys, and they went out and did habitat evaluations. Their assessment for these species had, like, four primary components. And so, in fact, and the record is clear on this on the ‑‑ I think it's around 193, 199 that talks about the suitability and capability issue. The wildlife biologist went out, and if he had any questions about the suitability of this habitat, he went out and he did studies. And they did surveys. Does the service object to having an on-the-ground requirement? Yes, Your Honor. Yes. All right. And is the Court entitled to weigh that? Just to take this case, does the service expect that there will be flammulated owls in this area that is suitable? If the service concluded it had doubts about that, would it have then decided not to pursue this type of undercutting and underburning? I mean, to what extent, if they had real doubts that the owls would come back, to what extent that would have played into their ultimate decision making? Yes, I'm trying to understand. You know, we're talking about this debate about whether the owls are important or not. Right. It sounds like the service plan decided the owls were an important component of this habitat area. It took the trouble in its judgment to go out and find out whether there are any there. Right. There's this conundrum of they went out, didn't hear any, so they're still, in effect, now relying on Dawson Ridge. I mean, if we – just let me finish. Sure. If we were to conclude as judges, just saying looking at the array of expectation and what the evidence shows, just applying common sense and say the service set for itself the objective of having habitat congenial to the owl, and the evidence doesn't show, in fact, the evidence may demonstrate that it really isn't. They aren't living up to their goal. Would that be sufficient to us, for us to then find something that is arbitrary and capricious to then proceed in the face of that? I think that any time a court – we think that the arbitrary and capricious standard of review, it's very deferential, and it's deferential to the expert judgments of the agency and, you know, looks to whether or not the agency's looked at relevant factors and come to a rational conclusion. All right. But that's what I'm asking. Right. No, I understand that. I understand there's no evidence on your own tests. No, no. If the record showed that, and you as a reviewing judge looked at the record and you'd say, no rational, no reasonable mind could come to the conclusion that this project will benefit flammulated owls, then I think you may very well have a decision that's arbitrary and capricious. That's a big step. That's no reasonable person could find. It's not the same test as reasonable minds could disagree. It's no reasonable person could find, based on this evidence, that flammulated owls would come back. Okay. So on my hypothetical, or most of what's going on, does the service at least have an obligation to tell us as judges in the EIS and in the decision-making process, does it have an obligation to explain why, having sent the biologists out, the service nonetheless concluded it was still consistent with their objective of protecting the habitat or making it hospitable to owls? I think that this particular record survives that level of scrutiny because, one, they have found owls in this habitat on the forest. My question was not whether it survived scrutiny. Does the service at least have the obligation to offer up the explanation for us to look at on some kind of review? I think that for this project, which is not a flammulated owl project, and I disagree with my opposing counsel on that point, I think, as Judge Kleinfeld indicated, this is a project intended to do four sort of major things in this area. That's not answering my question. No, no. I'm sorry, Your Honor. I just want to know, do you have an obligation to explain, not in an oral argument when we get it on appeal, but so when the record comes before the district court, it's there, not the lawyers coming into court and trying to ---- I totally want to be responsive. And so if your question is, does the agency have an obligation to say, we didn't find any owls but we still think our judgment's okay, I think that's right. But there's an important caveat to that, which is that there is an obligation on the part of people challenging these projects to come forward with comments. And, you know, this is the fundamental Vermont Yankee point, right? This is not a forum for game playing. It is a forum that is very structured for public participation. And so if your objection here is, well, the record comes up short because you didn't find some owls and so that calls your judgment into account and you didn't explain it, it's their obligation to have done that. And the difficulty for the Forest Service here all along has been the arguments keep shifting all the way through, and they've changed at every step along the way. Can we go back to your comment of we found owls in the habitat? You're talking about habitat outside the project area or habitat that includes the designated 277 acres? Yeah, that's a good question. And right now all I can recall for sure is that Dawson Ridge, which is the same habitat that the project is intended to create, right, that's what's at Dawson Ridge and that's what they're shooting for in the Michigan brush area. And you said earlier, we're getting back to the crux of his question, though, is you might have habitat that's suitable or even capable for sustaining owls, and it might be out there in other places, but that this is like a microcosm of its own experiment because this area has exactly the conditions that you're now trying to create, and it's had them for 30 years, and it doesn't have any owls. So what is the response to that argument, which is all your science aside, we actually have a real living experiment going on now, and it doesn't pan out? Well, first of all, I challenge the – I don't accept respectfully, Your Honor, the premise. I think that the Dawson Ridge area – and I commend to the Court's attention the Dawson Ridge report, which is a very similar circumstance. There has been – I mean, this all gets very complicated, right, because the forest treatments are different. There's a lot of different things that go on in the forest. But the connection between Dawson Ridge and the Michigan brush area is that for a number of years, the Forest Service has used the sort of same selective thinning, taken out the little duck fur that threatened the ponderosa pine and the larch, and they've burned that area, which is what they want to do in the Michigan brush, to open up this type of habitat that was on the forest historically. And in that area, they have had owls. And so – And owls. No, no, Your Honor. And having talked to the people who heard that hoot, they get upset when you call it a solitary hoot because they had an engaged response with this owl, and they've had – and I think the picture that Mr. Woodbury has put into you has shown that they have previously engaged these owls. So what about the – to follow up on Judge McEwen's question. Is the area that we're talking about here that your opponent concentrated on as being – he represented it to be an area that had been treated essentially the same way. And is that so? I don't think that is so, Your Honor. In fact, I think – It was logged, but differently. Right. And this notion – and the record shows this. The science that the Forest Service has relied on, the papers that they relied on, are relatively new about the advantages of mimicking fire disturbance by selective thinning in these Ponderosa pine areas. What does the record show about the area that is there, is in the project, and was logged? What do we know about that? I'm not sure how much – I mean, the record site that's been submitted – and Mr. Hortner may be able to help you if I can't, and I apologize. But the record site that Mr. Woodbury referred you to, and it's the same one that I would have referred you to – let me find it here very quickly. 193. 193 and 199 he mentioned. Right. I think I had in mind 199. Consists of areas where similar sort of selective logging has – that the same sort of efforts they're undertaking here. Were you planning to share, please? So that they do or they don't. That's from that understanding. Yes. I was planning on sharing. Yes. They do and they don't. I think that's right. They do and they don't or they don't. What? What is the – if they don't, why don't they? Let me be precise. That logging was not undertaken for the same purpose that the logging that's proposed here is engaged to do. And that purpose is found – you know, it's based on this foundational science that's in the record about the – To simulate fires, essentially. Right. The ecological benefits. Otherwise you're going to lose these big old Ponderosa pines. You're going to lose this dry site old growth and you're going to kind of monoculture the forest because those trees are being out- But the answer that we don't know whether these prior logging practices actually were along the same lines as the Forest Service is now. That's right. I think that's right. Because what 30 – logging practices 30 years ago, of course, had quite a different premise than they do now. Respectfully, Your Honor, my answer would have been better if this particular argument had been sort of laid out in some way previously, which it really hasn't. Let me just clarify a conceptual point. Someone asked you earlier, one of the judges, whether you were uncomfortable with any sort of on-the-site standard or requirement.  Yes. And I understand that you're not comfortable with it across the board, but would you agree that there are some circumstances in which the – to use your any rational scientist approach – would, in fact, go and look at the area? In other words, is it a context-specific answer and problem? I mean, potentially. But, you know, the- What about the soils problem in the original Lands Council case? First of all, why doesn't it turn partly on availability? You can't be sure to find a flammulated ale, but you can be sure to go and look at some soil and find out what's in the soil. But the problem is in none of – we don't have the record in Lands Council versus Powell in front of us, which is a point very well made by Judge McEwen in her Ecology Center versus Austin dissent. I don't know what that particular record said. But the troubling thing, right, for the United States and for the Forest Service is that a court found that we know better. That court said it must be on-the-ground analysis. That must be the best way to meet the soil standards in IFMA or whatever. And that is- What did they say is that, or did they say, if not, you have to tell us why not? Well, those are two different questions. But let me be very straightforward and blunt here. I think that Lands Council versus Powell stands for the proposition that that court was saying this is the way that you have to do it. And, you know, this is what Vermont Yankee teaches us. If our experts are entitled to deference, if you have a problem with our judgments along the way, you can bring them to the agency's attention and you can say, well, you haven't explained X or you haven't explained Y. And then you get a very nice record for this court to review, because by no means am I suggesting that we think that the APA standard is a rubber stamp. We think it's highly deferential, but it has dimension. And that dimension is for the court to see if we've considered the relevant factors, whether we've articulated a rational choice, those sorts of things. I'm going to yield my time to Mr. Horngren, and I apologize for taking so much. I would --. This is a very solid record. Why don't you just do that, then? Stop talking. All right. Thank you. Thank you, Your Honor. Scott Horngren on behalf of Intervenor Boundary County, and with me today is Commissioner Dan Denning from the county. I'd like to make two points this morning. First, we would urge the circuit to clarify that NFMA is not a wildlife preservation statute, but rather it sets forth a balanced approach to management of the national forest, considering all the multiple uses. But it does require, as I understand it, if there's a plan, the plan be complied with. Yes, it does. And I'll explain how they have complied with the plan as it relates to Flammulet et al. here in a moment. But we think that it's important in your opinion, we hope that in your opinion, that you will make a clear statement that the statute does not contain a wildlife viability mandate that transcends those other multiple uses. And secondly, that neither NEPA nor NFMA impose a burden on the Forest Service to prove with on-the-ground research that their actions won't harm wildlife. Could you help on the burden? Is the burden on the government to show that its science was good or at least was not arbitrary and capricious, or is the burden on the advocacy groups challenging the administrative agencies to show that the administrative agencies acted arbitrarily and capriciously in accepting that science? A softball question. Absolutely. The plaintiffs have the burden of proof in this case to show that the government was arbitrary and capricious. And as applied to Flammulet et al. in this case, we don't think they have met that burden. I agree with Judge Fisher. The Forest Service has a burden to explain what they're doing in the EIS. It's not for us attorneys to come, you know, after the fact to make up the record as to what happened here. And in this particular case, the Forest Service did provide the explanation. Number one, in a number of different ways. They went on the ground, they had habitat modeling, and they had research. And they looked at all three, and they discussed all three in the EIS. First, on the studies. They gathered studies from Colorado, the studies that were out there that they had, and from British Columbia that concluded that the Flammulet et al. uses forests that are anywhere from 35 percent to 65 percent canopy, mostly the dry site Ponderosa Pine Forest, which is where this treatment is occurring. And in addition, they found that based on their studies, there was some confusion over whether the Forest Service has actually found owls on the forest there. And they did find owls. And the place, if you'll look at ER-77, the place they found owls were the place that the forest had been treated before, had been harvested before, and had been under-burned. And that's what they want to do here. You know, what the Flammulet et al. likes is the moss. Kagan. Just a minute. Yeah. I'm sorry. Neither of the other lawyers who have argued so far thought that there was an owl found in this forest in similar areas. But you're saying there was. Absolutely. And the Forest Service explains that in ER-77. And those were areas where there had been under-burning that had been done. The reason why that's important, the reason why the Forest Service wants to do that here is because that creates brush. And the moss that the Flammulet et al. gets fat on live in the brush. And they explain that there. Can I ask you a question then coming back to what you said at the beginning, that you want us to say that species preservation or viability does not transcend other objectives. But if the services plan marks out species viability as one of its objectives, and in their testing they find out in what appears to be a reasonable judgment, common sense judgment, that they have failed to establish that objective, that in fact they want the owl habitat to be preserved, to be encouraged, sustained, whatever the word may be. And the evidence that they put forward is absolutely inconclusive on its suggest, if anything, that it isn't going to accomplish it. What do judges do with that kind of record? If it suggests, I would say you do not reverse the Forest Service. You balance. There's going to be conflicting science. The Forest Service doesn't have to use the best science. They get the benefit of the tie in this case. If, in fact, it's absolutely contrary to the science, then maybe you reverse them. But let me say, let me change it slightly.  I couldn't find the owl, and that creates great disquieting. I can't establish that they aren't there, but I'm now very concerned that they aren't. And if that's the only thing that you had, I would still argue that's a tie. But on this record, Your Honor, they looked at the studies. They went out to areas that had been treated before. An important point here, which counsel hasn't mentioned. When you talk about harvest that has occurred for 30 years, 30 years ago they weren't putting limits on the size of trees that they were harvesting. They weren't designing their sales to provide flammulated owl habitat. They have the studies now that have indicated that elsewhere in the West where they find flammulated owls, they're not in the dense stands like you have the picture of there that is choked with forest. If you were to go back to your very first statement, you said this isn't a wildlife liability mandate. But if you go to NMFA and it talks about a forest plan, and then in Idaho Sporting Congress we were quoting back to NMFA and the forest plan, we say that the forest plan has to meet the Forest Act requirements. And it says designed to ensure continued diversity of plant and animal communities and the continued viability of wildlife in the forest. It seems to me your statement that you began with is totally at odds with the statute. It is, which should make you look closely at Rittenhouse, because if you turn to the statutory language, it's 16 U.S.C. 1604 G3B. You will find that it says the NFMA directs the secretary to develop forest plans, quote, which provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet multiple use objectives and within the multiple use objectives of the land management plan. Those variety of purposes that I think Judge Kleinfeld pointed out. And your cases have got it wrong and have not. Ginsburg. So in other words, you're suggesting that the tagline on wildlife viability is not a correct State law statute? That's correct. That's correct. And the other one is that if the forest plan sets up a particular goal with regard to viability and diversity, that is binding. And isn't that the problem here? That you're absolutely right. The forest plans, as they are required to do under the National Forest Management Act, though, have multiple goals. And one of the goals that the Forest Service is trying to do here is to try to keep this forest from burning up. It's no good for flammulated owls if it has no canopy closure because a fire goes through it. I turn the ---- refer the Court to Supplemental Excerpt of Record 490. And I guess I'll conclude with this. If you would look at that, it isolates the stands, the 277 acres we've been talking about today, Supplemental Excerpt of Record 490. And it shows that the Forest Service took the hard look, if you will, on how they're going to treat these old-growth stands. And significantly, it shows what, based on on-the-ground visits, what the residual trees are being removed by the harvest. And in this particular instance, you'll see they've broken it down by the size of trees. There will be no trees harvested that are over 21 inches. There will be no trees that are harvested that are over 16 inches. After the treatment, there'll be ---- I see I'm out of time here, if I might conclude, Your Honor. Please do. There will be trees that are over 20 inches in diameter, 12 trees per acre, which exceed the definition of old-growth that the Green Study has shown. And plaintiffs in this case and other cases have said they don't have any problem with the Green definition of old-growth. These stands will meet that definition. The Forest Service has carefully considered this. We would urge that the Forest Service is not required to do on-the-ground research to proceed with this study, that they have met the arbitrary and capricious standard, and would ask you to affirm the project. Thank you. Your Honor, the Forest Plan here requires the Forest Service to provide minimum viable populations of all wildlife species. The way the Forest Plan does that is not by monitoring populations, but substituting habitat models. The habitat models are forest-wide models. They're based on TSMRS database found invalid by this Court and Lands Council. That's at 193, where they say they still, in response to Lands Council v. Powell on SCR 193, the Forest Service nonetheless says we are presuming that the TSMRS database is reliable in direct contradiction to what this Court found. And in order to, therefore, validate this model, since the TSMRS database is not reliable, they sent biologists out to look for flammulated owls. They did presence and absence surveys. They found absence. They found no flammulated owls. Therefore, they point to Dawson Ridge. If you look at the color photo, which is much more revealing than what the black and white you had, you will see the area where they heard the flammulated owl, not found the flammulated owl, is on the road. And you will see a creek right next to that road. Within 600 feet is unlogged, untreated flammulated owl habitat as part of a buffer zone that widens out above into a vast expanse of untreated, unlogged habitat for the flammulated owl. And they have no idea where that flammulated owl's nest was, and they didn't look for it. And if you want to know whether they could have looked for it there or could have detected flammulated owls in the project area, look at SER 623 Reynolds and Linkhart, which is good science by Forest Service Research Station, where their expert biologists are.  They can put radio transmitters on them. They can find their nest. They can identify their territories. They can do everything that they want to, if they want to, as opposed to here, where they just got out of their truck on a road and heard a flammulated owl and were satisfied. One out also in that area. I think using periods. I'm sorry? Get to a period. I'm sorry. You will also see from Reynolds and Linkhart, flammulated owls are very territorial and will return to their territory every year, and rarely will they leave that territory, especially the males. Thank you. The single flammulated owl they heard could have been ñ it wasn't a pair. It wasn't a breeding pair. It was one owl. And it tells us nothing about whether or not it's a viable population of flammulated owls left. I'm sorry. I was reading it wrong. Thank you. I still have that much time. Case just argued. We'll stand submitted. We are adjourned.
judges: Kozinski, Rymer,kleinfeld, Hawkins, Silverman, McKeown, Fisher, Berzon, Clifton, M Smith, Nr Smith,cjj